GEORGE E. JOHNSTON,[1]      :
    Plaintiff,           :          CIVIL ACTION NO.
                        :          3:16–cv–1466 (JCH)
    v.                 :
                        :
NANCY A. BERRYHILL, Acting    :          JULY 7, 2017
Commissioner, Social Security    :
Administration,               :
    Defendant.[2]        :

**RULING RE: MOTION FOR JUDGMENT ON THE PLEADINGS (DOC. NO. 13) &
MOTION TO AFFIRM THE COMMISSIONER'S DECISION (DOC. NO. 16)**

## I.    INTRODUCTION

Plaintiff George E. Johnston ("Johnston") instituted this action pursuant to

section 405(g) of title 42 of the United States Code to challenge various aspects of a

decision of the Commissioner of the Social Security Administration ("Commissioner").

See Compl. (Doc. No. 1) ¶¶ 1, 16, 21–22. Johnston seeks reversal, in part, of a

Decision rendered by Administrative Law Judge ("ALJ") Ryan A. Alger, see generally

Certified Tr. of Record ("Tr.") (Doc. Nos. 11-1 – 11-26) at 883–909, and affirmed by the

Appeals Council, see generally Tr. at 875–82. The ALJ granted Johnston's application

---

[1] Plaintiff's name appears as "George E. Johnson" on the docket for this case in the CM/ECF filing system, likely because that is how plaintiff's name appears in the caption of his Complaint. See Compl. (Doc. No. 1) at 1. It is clear, however, that this is a typographical error, and plaintiff's last name is properly spelled "Johnston." See, e.g., id. at 1 (referring to plaintiff in first line of Complaint as "GEORGE E. JOHNSTON"); Mot. for J. on Pleadings (Doc. No. 13) at 1 (spelling plaintiff's last name with a "t"); Def.'s Mem. in Supp. of her Mot. for an Order Affirming the Commissioner's Decision (Doc. No. 16) at 1 (same). The Clerk is therefore directed to amend the caption of this case to set forth the proper spelling of plaintiff's name: "George E. Johnston."

[2] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is hereby substituted as the defendant in this case, in place of the former Acting Commissioner of the Social Security Administration, Carolyn W. Colvin. See Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity . . . resigns[ ] or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party."). The Clerk of Court is directed to correct the docket to reflect this substituted party.

for Supplemental Security Income ("SSI") from April 1, 2014 forward; however, he denied Johnston's application for SSI prior to April 1, 2014 and denied his application for Social Security Disability benefits ("SSD") in all respects. See id. at 903.

Johnston filed a Motion for Judgment on the Pleadings, seeking partial reversal of the ALJ's Decision. See generally Mot. for J. on Pleadings (Doc. No. 13); Mem. of Law in Supp. of Pl.'s Mot. for J. on Pleadings ("Mot. to Rev.") (Doc. No. 14). In response, the Commissioner filed a Motion responding to Johnston's arguments, and seeking affirmance of the Commissioner's Decision. See generally Def.'s Mem. in Supp. of her Mot. for an Order Affirming the Commissioner's Decision ("Mot. to Affirm") (Doc. No. 16). The parties have also jointly filed a stipulation of agreed-upon facts. See generally Joint Stipulation of Facts ("Joint Stip.") (Doc. No. 15).

For the reasons set forth below, the Motion for Judgment on the Pleadings (Doc. No. 13) is **GRANTED IN PART AND DENIED IN PART**, and the Motion to Affirm (Doc. No. 16) is **DENIED**. The case is remanded to the Commissioner.

## II.    BACKGROUND

### A.    Facts[3]

Johnston was born on April 1, 1959. See Joint Stip. at 2. A high school graduate, he has worked as a glass installer, a welder, an auto body repairman, and an auto mechanic. See id.

---

[3] The facts set forth herein are derived from the parties' Joint Stipulation of Facts (Doc. No. 15), unless otherwise noted, and are limited to those necessary to rule on the pending Motions. To the extent the court relies on other material in the Record, that information will be referenced in the portions of this Ruling, see generally infra Part IV, to which it relates.

In late January 2007, Johnston underwent an MRI of his lumbar spine, which revealed: a "small L2-L3 midline disc herniation; progression of an L3-L4 disc bulge shown on an earlier imaging study; multilevel disc degeneration; and bilateral L4-L5 and L5-S1 foraminal narrowing caused by degenerative end-plate spurring." Id.

Almost two years later, on January 8, 2009, Dr. Alan L. Schwarz ("Dr. Schwarz")—a board-certified family practitioner—evaluated Johnston for acute and chronic lower back pain and for hypertension. See id. Johnston also reported right foot pain and stated that he had run out of his medication. See id. at 2–3. A physical examination suggested mild pain upon palpation of the right foot and pain upon palpation and movement of Johnston's lower back. Id. at 3. Dr. Schwarz diagnosed Johnston with right foot pain and acute and chronic lower back pain, and he prescribed Oxycodone. Id.

Johnston saw Dr. Schwarz again on January 28, 2009, and on February 23, 2009. See id. On these occasions, he reported "a lot" of low back and leg pain, as well as mobility issues. See id. His back and leg pains were "essentially unchanged" at later visits with Dr. Schwarz, through the end of 2009. See id.

On May 31, 2009, July 4, 2009, November 29, 2009, and December 25, 2009, Johnston presented at the Windham Hospital emergency room with back pain and leg pain. See id. at 3–4. Physical examinations during these visits often revealed a limited range of motion. See id. at 3–4. At each of these ER visits, Johnston was prescribed Oxycodone or Percocet. See id. at 3–4.

In January 2010, Johnston saw Dr. Schwarz again, complaining of ongoing chronic low back pain, hypertension, and knee pain. See id. at 4. At this appointment,

Johnston was diagnosed with vocal cord polyps, hoarseness, chronic obstructive pulmonary disease ("COPD"), chronic low back pain, joint pain, fluid retention, and atrial fibrillation with fast ventricular response; he was also identified as a cigarette smoker. See id. Dr. Schwarz prescribed Cardizem and Oxycodone, and again prescribed Oxycodone at Johnston's next visit on March 29, 2010, which came on the heels of a hospitalization arising out of a seizure Johnston suffered. See id.

Johnston returned to the emergency room on April 18, 2010 for "mild back pain," and at least once a month thereafter, through November 7, 2010, for chronic back pain and leg pain. See id. at 5. He exhibited limited range of motion in his back and was prescribed Oxycodone, Coumadin, Quinapril, Lasix, Metoprolol, and Keppra. Id.

Dr. Schwarz observed Johnston in moderate distress at a June 4, 2010 appointment, identifying an irregular heart rhythm, tenderness to palpation in the left and right paraspinal area, bilateral muscle spasms, and restricted and painful flexion and extension in the lumbar spine. Id. Once again, Dr. Schwarz prescribed Oxycodone. Id.

A different physician, pain management specialist Dr. Craig E. Foster ("Dr. Foster"), met with Johnston on July 20, 2010 to address Johnston's back and leg pain. See id. Dr. Foster diagnosed Johnston with chronic back pain and recommended that Johnston begin taking a longer-acting medication, such as Oxycontin, in addition to Lyrica. See id. at 5–6.

Johnston returned to Dr. Schwarz on July 29, 2010, as well as on August 4, 2010, August 9, 2010, August 16, 2010, August 23, 2010, and several more times through the end of 2010. See id. at 6–7. For much of this period, Johnston's back and

leg pain remained essentially unchanged, though he did report worsening lower back pain and extremity pain at certain points.  See id. at 6–7.  Johnston was prescribed Oxycodone and Morphine.  See id. at 6–7.

On January 20, 2011, Johnston reported worsening pain in his back and legs.  Id. at 7.  Dr. Schwarz examined Johnston, and again prescribed Oxycodone.  Id.  At a February 4, 2011 visit to Dr. Schwarz, Johnston evinced virtually identical physical limitations and was prescribed Oxycodone.  Id.

Johnston briefly interrupted this pattern of visits to the ER and with Dr. Schwarz, when he was evaluated at Connecticut Sport and Spine Physicians ("CSPS") on February 10, 2011, and during the two months that followed.  See id. at 11–12.  At CSPS, Johnston was diagnosed with intervertebral disc displacement of the lumbar spine with disc degeneration and facet hypertrophy, lumbago, and thoracic or lumbosacral neuritis or radiculitis.  Id. at 11–12.  Johnston was prescribed Cymbalta and OxyContin.  See id. at 12.  Johnston was administered bilateral L3-L4 transforaminal epidural injections on March 10, 2011.  See id.

On March 19, 2011, Johnston went to the emergency room, seeking relief for severe, sharp, low back pain that radiated to his legs.  Id. at 7.  He was noted to have tenderness in the lumbar paraspinal muscles and decreased range of motion.  Id. at 7–8.  He was diagnosed with back pain and a back spasm, and this time prescribed Valium.  See id. at 8.  When Johnston was seen two days later at CSPS, he reported that he had experienced spasms, lasting fifteen minutes, down both of his legs over the previous several days.  See id. at 12.

Dr. Schwarz completed a Multiple Impairment Questionnaire on March 22, 2011. Id. at 8. He diagnosed Johnston with: "chronic low back pain, COPD, hypertension, obesity[,] and a seizure disorder." Id. His chronic low back and leg pains, according to Dr. Schwarz, prevented him from sitting and from standing/walking more than one hour per eight-hour workday. Id. Dr. Schwarz further expressed the belief that Johnston would need breaks to rest every thirty minutes during the workday, each at least ten minutes long, and would likely miss work more than three times per month. Id. Dr. Schwarz opined that Johnston could "occasionally" lift or carry objects that weighed five pounds, but that Johnston's chronic pain resulted in significant limitations in repeatedly reaching, handling, or lifting objects. Id. He had further moderate limitations in his ability to use his upper extremities to grasp, twist, or turn objects and to use his arms for reaching, including overhead. Id. Dr. Schwarz suggested that Johnston's symptoms were constantly so severe as to interfere with his ability to concentrate. Id. Dr. Schwarz did not believe that Johnston was a malingerer. Id.

Johnston returned to CSPS on April 7, 2011, and stated that his back pain had worsened after the epidural injections he had received in March; he was prescribed Oxycodone. Id. at 12.

From late April 2011 through August 2011, Johnston went to the Windham Hospital emergency room many times. See generally id. at 9–10. He most often complained of lower back and leg pain at these visits, and he showed a limited range of motion. See, e.g., id. at 9. Notably, however, Johnston's visits to the ER in July 2011 were driven by his effort to seek treatment for right arm pain. See id. at 9–10. In fact, an MRI on July 29, 2011 showed a partial tear in his biceps, a complete tear of the

lateral collateral ligament, and several other partial tears.  See id. at 10.  Virtually every—if not every—time he visited the Windham Hospital emergency room, Johnston was prescribed painkillers and/or other prescription medications.  See id. at 9–10.

Johnston's visits to the Windham Hospital emergency room overlapped with the start of his trips to the Rockville General Hospital ("Rockville") emergency room.  See id. at 12.  Johnston frequently sought evaluation and treatment at the Rockville ER from May 18, 2011 through February 13, 2012.  See id.  These visits revealed similar lower back pain and limitations on his range of motion, among other, related abnormalities.  See id.  Over the course of these visits, doctors at Rockville prescribed Oxycodone, OxyContin, Ultracet, Clonidine, Percocet, Robaxin, Norflex, and Prednisone.  See id. at 12–13.

On October 10, 2011, Johnston underwent an MRI of his lumbar spine.  Id. at 10.  The MRI revealed various disc bulges, thecal sac narrowings, and other irregularities.  See id. at 10–11.  More than two months passed before, on December 23, 2011, Johnston visited the ER once again for severe, constant back pain.  Id. at 11.

Johnston began treating with Dr. Loretta Pilagin ("Dr. Pilagin") on January 24, 2012.  See id. at 13.  At an appointment with Dr. Pilagin a month later, Johnston reported that he was having a hard time finding long-term care.  See id.  When she examined Johnston on March 9, 2012, Dr. Pilagin noted decreased breathing sounds, peripheral edema, abdominal tenderness, and decreased sensation in the right lower extremity.  See id.  Johnston received another prescription for Oxycodone.  Id.

On April 13, 2012 and June 8, 2012, Johnston reported that he had increased lower back pain which led Dr. Pilagin to prescribe Oxycodone after the first of these visits and Oxycodone and Losartan after the second. See id.

As Dr. Schwarz had previously, Dr. Pilagin completed a Multiple Impairment Questionnaire on August 27, 2012. Id. She diagnosed Johnston with: lumbar degenerative disc disease status post fusion with right radicular pain, atrial fibrillation, seizure disorder, and COPD. Id. Johnston's primary symptoms were pain in his lower back and right lower extremity, difficulty breathing, shortness of breath, palpitations, and difficulty climbing stairs. See id. at 14. Dr. Pilagin expressed her belief that, in an eight-hour workday, Johnston could sit for three hours total with breaks, stand/walk for three hours total with breaks, and needed to stand and move around every thirty minutes for five to ten minutes at a time when he was sitting. See id. Further, Dr. Pilagin stated that Johnston could lift or carry objects that weighed ten pounds only occasionally. Id. She did not believe that Johnston was a malingerer, noting further that Johnston would need unscheduled fifteen-minute breaks each hour during an eight-hour workday. Id.

In a narrative she completed on August 31, 2012, Dr. Pilagin repeated Johnston's diagnoses, while opining that he had significant limitations and conditions that she expected to gradually worsen over time and to prevent him from working full-time. See id.

Johnston's reports of back pain—on October 2, 2012—and leg pain—on March 11, 2013—continued, as did his prescriptions for Oxycodone. See id.

Dr. Pilagin prepared a report, dated March 25, 2013, in which she diagnosed Johnston with degenerative lumbar spine disease, COPD, atrial fibrillation, and

seizures.  See id.  She opined that his symptoms were progressive and a result of a lumbar fusion performed in 1999.  See id. at 15.  According to Dr. Pilagin, Johnston remained unable to work, as he could not perform the job for which he was trained or learn to do a different job because of his medications and chronic illnesses.  See id. This time, Dr. Pilagin suggested that Johnston could only sit for one hour or less and stand/walk for one hour or less in an eight-hour workday.  See id.  He could occasionally lift or carry ten-pound objects, could not use either foot to repeatedly push or pull leg controls, could not bend, squat, crawl, or climb, could not drive automotive equipment, and could never be exposed to unprotected heights, moving machinery, significant temperature and humidity fluctuations, or dust and fumes.  See id.

In follow-up doctor appointments in early May, June, July, and August 2013, Johnston reiterated reports of pain in his back—which he said "always hurt[ ]"—and in his legs.  See id.  At an October 28, 2013 appointment, Johnston indicated that he had recently visited the emergency room for joint swelling, and was suffering from increased chronic back pain and depression.  See id.  Similarly, on December 26, 2013, Johnston said his pain was not adequately under control.  Id.

B.    Procedural History and Relevant Testimony

On November 4, 2010, Johnston filed applications for SSD and SSI, claiming disability onset as of October 31, 2008.  See id. at 1.  Dr. Khurshid Khan ("Dr. Khan")— a state agency physician—reviewed the medical evidence in this case and concluded that Johnston could perform a range of light work.  Id. at 15; see generally Tr. at 81–89. A second state agency physician, Dr. Firooz Golkar ("Dr. Golkar") also articulated a view that Johnston could perform light work.  See generally Joint Stip. at 16; Tr. at 102–

11.  Johnston's claims were initially denied, and Johnston requested a hearing before an ALJ which was held on November 10, 2011.  Joint Stip. at 1.  However, by Decision dated November 22, 2011, the ALJ denied Johnston's claims, finding that he was not disabled.  See Joint Stip. at 1; see generally Tr. at 22–39.  Though Johnston requested review from the Appeals Council, it denied review on November 20, 2012.  See Joint Stip. at 1; see generally Tr. at 1–7.

Johnston then filed suit in this court, seeking reversal of the Commissioner's decision.[4]  See Joint Stip. at 1.  The court issued a Ruling, see generally Tr. at 939–48,[5] affirming and adopting a Recommended Ruling prepared by Judge Fitzsimmons, see generally Tr. at 949–1017.  Johnston's claims were remanded to the Commissioner for further proceedings.  See Joint Stip. at 1.  Shortly thereafter, on June 16, 2014, the Appeals Council remanded the claim for a new hearing and decision consistent with this court's Ruling.  See id.; see generally Tr. at 935–38.

ALJ Ryan A. Alger held another hearing in this case on December 4, 2014, see Joint Stip. at 2; see generally Tr. at 910–34, at which Johnston testified.  Johnston's testimony at this Hearing overlapped, to some extent, with his testimony before the first ALJ in November 2011.  Johnston testified that, in October 2008, he stopped working because certain items he needed to lift or carry in the course of his work had become too heavy.  See Joint Stip. at 16.  Thigh pain radiating down to his ankle, lower back pain, and burning pain and spasms in both shoulders also caused Johnston difficulty in

---

[4] The docket number for that case was 3:13–cv–73 (JCH).

[5] This court's Ruling is also available at the following citation: Johnston v. Colvin, No. 3:13–cv–73 (JCH), 2014 WL 1304715 (D. Conn. Mar. 31, 2014).  However, the court will cite to the pagination of the Ruling reflected in this case's administrative record, for ease of reference.

working.  Id.  Twisting, bending, and certain other movements exacerbate his shoulder pain.  Id.  The consistent pain in his lower back is made worse by lifting, twisting, and bending, and his leg pain is made worse by lifting certain objects.  Id.

Johnston guessed that he can hold two gallons of milk for approximately fifteen to twenty minutes before the pain in his shoulders and back prevents him from doing so. Johnston said he is able to walk approximately three blocks and to stand for twenty to thirty minutes at a time.  Id.  Climbing stairs in the house—which he shares with his girlfriend and her son—presents a challenge three days a week, at which times Johnston's COPD manifests itself.  See id.  Johnston frequently goes for a walk outside, either to walk the dog or just to get some fresh air.  See id.  Johnston testified that he lies flat for a "couple of hours a day" to minimize his pain.  See id.  He spoke about his efforts to restore an old truck, a project that took him three years instead of the three to six months he says it should have taken.  See id.  This delay was attributed to his inability to work for more than thirty minutes at a time, every two days.  See id. Johnston's medicines induce drowsiness, and though he has difficulty sleeping at night due to the pain, he naps for one to two hours nearly every day.  See id. at 16–17. Notwithstanding his years of treatment—including surgery, injections, and physical therapy—Johnston reported that his back pain has not improved.  Id.

The ALJ issued his Decision on January 26, 2015, see generally Tr. at 883–909, concluding that Johnston was disabled beginning on April 1, 2014, but at no time before that date, see id. at 902.  Specifically, he found that despite the severe impairments of degenerative disc disease, obesity, COPD, and epilepsy, Johnston maintained sufficient residual functional capacity ("RFC") to perform "light work."  See id. at 893–900.  The

ALJ modified this general RFC to acknowledge that Johnston: should avoid exposure to hazardous machinery and unprotected heights; could occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; should be permitted to switch between sitting and standing throughout the workday; could stand and walk a total of four hours in an eight-hour workday; and could tolerate only occasional exposure to high concentrations of airway irritants. See id. at 893. Though Johnston could not perform any of his past work, the ALJ found that he could perform other work, as a receptionist, general officer clerk, or production inspector, prior to April 1, 2014. See id. at 901–02. On April 1, 2014, Johnston turned 55 and his age category changed. Id. at 902. The ALJ found that, beginning on April 1, 2014, there were no jobs in sufficient numbers in the national economy that Johnston was capable of performing. See id.

Johnston asked the Appeals Council to review the portion of the ALJ's Decision that determined he was not disabled from October 31, 2008 through March 31, 2014. See id. at 2. The Appeals Council denied Johnston's request on May 2, 2016. See id.; see generally Tr. at 875–82. Following this final act of the Commissioner, see Joint Stip. at 2, Johnston filed this case.

III.   **LEGAL STANDARDS**

The court will only set aside an ALJ's Social Security disability determination if "it is based upon legal error or is not supported by substantial evidence." Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)). "Substantial evidence is 'more than a mere scintilla.'" Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009)). This "very deferential standard of

review" requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>See</u> <u>id.</u> at 447–48 (quotation marks, citations, and emphases omitted).

The court may reject an ALJ's factual findings "only if a reasonable factfinder would <u>have to conclude otherwise</u>." <u>Id.</u> at 448 (quoting <u>Warren v. Shalala</u>, 29 F.3d 1287, 1290 (8th Cir. 1994)). Moreover, "[t]he substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact." <u>Gonzalez v. Apfel</u>, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citing <u>Rodriguez v. Califano</u>, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)). At base, when "an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." <u>Yancey v. Apfel</u>, 145 F.3d 106, 111 (2d Cir. 1998) (citing <u>Williams v. Bowen</u>, 859 F.2d 255, 258 (2d Cir. 1988)); <u>see also</u> <u>Rutherford v. Schweiker</u>, 685 F.2d 60, 62 (2d Cir. 1982) ("We would be derelict in our duties if we simply paid lip service to this rule [that Commissioner's factual findings shall be conclusive if supported by substantial evidence], while shaping our holding to conform to our own interpretation of the evidence." (citation omitted)).

## IV. DISCUSSION

In evaluating an individual's claim for either SSI or DIB, he:

shall be considered to be disabled . . . if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(a); <u>see also</u> 42 U.S.C. § 423(d)(1)(A). Claims for Social Security benefits are evaluated by reference to a familiar, five-step analysis:

First, the Commissioner of Social Security considers whether the claimant is currently engaged in "substantial gainful activity." If he is not, the Commissioner proceeds to the second step and determines whether the claimant has a "severe medically determinable physical or mental impairment," that "significantly limits his physical or mental ability to do work activities." If the claimant does suffer such an impairment, the third step is "whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations." If so, the claimant is per se "disabled" and thus presumptively qualified for benefits. If not, the Commissioner proceeds to the fourth step and examines whether, "despite the claimant's severe impairment, he has the residual functional capacity to perform his past work." If the claimant is unable to perform his past work, the Commissioner finally determines whether there is other work the claimant can perform, taking into consideration the claimant's RFC, age, education, and work experience.

Petrie v. Astrue, 412 F. App'x 401, 404 (2d Cir. 2011) (summary order) (citations omitted); see also Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)).

In this case, Johnston offers two arguments as to why the Commissioner's decision should be reversed or remanded. First, he argues that the ALJ did not properly weigh the medical opinion evidence in determining Johnston's RFC. See Mot. to Rev. at 1. Johnston takes issue with the ALJ's consideration (or lack thereof) of opinions rendered by his treating physicians, see generally id. at 1–6, and with the ALJ's decision to afford great weight to opinions rendered by non-treating state agency medical consultants, see generally id. at 6–8. Second, Johnston contends that the ALJ did not properly evaluate his credibility in determining his RFC. See generally id. at 8–11.

A.    Medical Opinion Evidence

1.    Treating Physician Rule

"The [Social Security Administration] recognizes a rule of deference to the medical views of a physician who is engaged in the primary treatment of a claimant." Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015) (per curiam). "According to this rule,

the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)). Even where the treating physicians' opinions do not have such support in the record—and so are not given controlling weight—the ALJ must consider "several factors in determining how much weight the opinion should receive." See Greek, 802 F.3d at 375 (citing 20 C.F.R. § 404.1527(c)(2)(i), (2)(ii), (3)–(6)). "In order to override the opinion of the treating physician, . . . the ALJ must explicitly consider, inter alia: (1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing Burgess, 537 F.3d at 129).

The ALJ gave the opinions of Dr. Schwarz and Dr. Pilagin some weight in determining Johnston's RFC. See Tr. at 898, 900. The ALJ found certain portions of these opinions consistent with other evidence, but others inconsistent with, inter alia, medical reports, Johnston's own testimony, and treatment notes in the record. See id. at 898–900.

Notably, in her Recommended Ruling that was affirmed and adopted by this court in Johnston's first appeal from the Commissioner's initial determination, Judge Fitzsimmons explicitly rejected Johnston's arguments that Dr. Schwarz's opinion was entitled to controlling weight. See Tr. at 1006–08. Here, the court again concludes that

the ALJ did not err in declining to give Dr. Schwarz's and Dr. Pilagin's opinions controlling weight. There was substantial, inconsistent evidence in the record.

During the time period at issue, Johnston regularly described his pain as moderate, in the course of his visits to Windham Hospital. See, e.g., Tr. at 337, 342, 400, 439, 453. On at least one hospital trip, he reported only mild pain, a "0" on a scale from zero to ten. See id. at 376, 381. Johnston was often able to maintain a normal gait or showed back flexion to ninety degrees, or both. See, e.g., id. at 299, 311, 325, 329. Even when he reported moderate to severe back pain, Johnston was sometimes able to walk around the examination room without appearing to be in significant distress. See, e.g., id. at 442–43, 484. Moreover, the October 10, 2011 MRI— performed in the middle of the time period for which Johnston seeks benefits—revealed only "[m]ild to moderate disc degenerative changes," mild to moderate thecal sac narrowing, and "[o]nly mild neural foraminal narrowing . . . at multiple levels." See id. at 871–72. This evidence is inconsistent with the opinions offered by Drs. Schwarz and Pilagin and is substantial, thus obviating the otherwise applicable mandate that the opinion of Johnston's treating physicians be given controlling weight. In declining to give the treating physicians' opinions controlling weight, the ALJ did "not substitute his own layperson judgment of the medical findings . . . ." See Mot. to Rev. at 3. Rather, he properly accounted for the substantial evidence inconsistent with the treating physicians' opinions.

However, this determination does not necessarily dictate a conclusion that the ALJ properly weighed the treating physicians' opinions. The court must also inquire as to whether the ALJ "explicit[ly] consider[ed], inter alia: (1) the frequen[c]y, length, nature,

and extent of treatment; (2) the amount of medical evidence supporting the opinion;

(3) the consistency of the opinion with the remaining medical evidence; and (4) whether

the physician is a specialist." Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) (per

curiam) (citing Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008)). If the ALJ

discounts the opinion of the claimant's treating physician, he must give "good reasons"

for doing so. See Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008). Nevertheless,

the court does not "require [ ] slavish recitation of each and every factor where the ALJ's

reasoning and adherence to the regulation are clear." Atwater v. Astrue, 512 F. App'x

67, 70 (2d Cir. 2013) (summary order) (citing Halloran v. Barnhart, 362 F.3d 28, 31–32

(2d Cir. 2004) (per curiam)). At the outset of this inquiry, it is important to note that the

court remains bound to uphold the ALJ's determination so long as it is supported by

substantial evidence and reached after a consideration of the factors set forth

immediately above.

The ALJ clearly addressed "the frequen[c]y, length, nature, and extent of

treatment" in determining that each treating physician's opinion was entitled to "some

weight." See Tr. at 898–900. He noted that "Dr. Schwarz is a treating physician who

has treated the claimant since at least 2007 . . . and is in a position to be familiar with

the claimant's symptoms and limitations." See id. at 898. Similarly, the ALJ

acknowledged Dr. Pilagin's status as "a treating source, who has treated the claimant

since January 2012, as his primary care physician." See id. at 899–900.

Nevertheless, the ALJ appears once again, see id. at 1010 (noting first ALJ's

failure to consider information supporting treating physician's opinion), not to have

meaningfully considered the medical evidence supporting the treating physicians'

opinion. In her Recommended Ruling in Johnston's first appeal, Judge Fitzsimmons admonished the ALJ for failing to acknowledge "medical records from Connecticut Spine and Sports that note, for example, that plaintiff 'may have a significant degree of facet joint mediated pain contributing to his discomfort in his low back'; 'has cervical spondylosis with stenosis'; has decreased cervical and lumbar lordosis; has intervertebral disc displacement lumbar without myelopathy; and whose 'body habitus and description suggest compressed lateral femoral cutaneous nerves.'" Id. (citations omitted). Instead of expressing recognition of this evidence, however, the ALJ focused his analysis, of the opinions offered by Drs. Schwarz and Pilagin, on discrediting them. See generally id. at 898–900. Nor can the court conclude with any confidence that the ALJ elsewhere considered the evidence that would support the treating physicians' conclusion: there is virtually no discussion of such evidence in the portions of the ALJ's Decision that precede his specific discussion of the treating physicians' opinions. See generally id. at 893–98. While the ALJ's analysis might satisfy the requirement that he address the "consistency of the opinion with the remaining medical evidence," see Selian, 708 F.3d at 418, it neither cites nor addresses information supporting the treating physicians' opinions.[6]

It is also troubling that the ALJ appears to have repeated an error that was pointed out in Johnston's earlier appeal. In the Recommended Ruling that was affirmed and adopted by this court, Judge Fitzsimmons reminded the Commissioner that "the

_____

[6] The Commissioner appears to defend the ALJ's decision by noting the points on which the ALJ did credit the opinions of the treating physicians as consistent with the medical evidence. See, e.g., Mot. to Affirm at 2. These acknowledgments of the accuracy of certain aspects of the treating physicians' opinions do not, however, evince any recognition of the objective evidence in the record supporting those portions of the treating physicians' opinions to which the ALJ did not give credence or explain why he did not find such corroborative evidence sufficient to give the treating physicians' opinions greater weight.

opinion of the treating physician [is not] to be discounted merely because he has recommended a conservative treatment." See Tr. at 1010 (quoting Burgess, 537 F.3d at 129). Yet the ALJ apparently relied, in part, on a conservative treatment regimen as justification for rejecting Dr. Pilagin's opinion. See id. at 900 (noting that Dr. Pilagin's treatment notes "routinely did not note any limitations and simply continued [Johnston] on his medication regimen").

An ALJ's failure to provide "good reasons" for giving only "some weight" to the opinion of a treating physician constitutes an independent reason to remand the case to the Commissioner. See Burgess, 537 F.3d at 129–30 (citing Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999)). The failure of the ALJ to provide those "good reasons" in this case warrants remand.

### 2. Non-Examining Physicians

Johnston also contends that the ALJ improperly weighed the medical opinion evidence by giving "great weight" to the opinions of two non-examining physicians, Drs. Khurshid Khan and Firooz Golkar. See Mot. to Rev. at 6–8. A non-examining physician's opinion is "opinion evidence which can be given weight if supported by medical evidence in the record." Frye ex rel. A.O. v. Astrue, 485 F. App'x 484, 487 (2d Cir. 2012) (summary order) (citing 20 C.F.R. § 416.927(e)(2)). "The ALJ is permitted to conclude that the opinion of a treating source should be given less weight than that of a non-examining source, if the opinion of the non-examining source is more consistent with the records as a whole." Wright v. Colvin, No. 3:16–cv–463 (JCH), 2017 WL 202171, at *6 (D. Conn. Jan. 18, 2017) (citing Camille v. Colvin, 104 F. Supp. 3d 328, 343 (W.D.N.Y. 2015), aff'd 652 F. App'x 25 (2d Cir. 2016) (summary order)).

Nevertheless, "[t]he general rule is that the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability." Vargas v. Sullivan, 898 F.2d 293, 295 (2d Cir. 1990) (quoting Allison v. Heckler, 711 F.2d 145, 147–48 (10th Cir. 1983)).

Notably, the ALJ responded to the previously-identified defects in the prior ALJ's Decision, see Tr. at 945–48, 1011–14, by giving only "little weight . . . to [the non-examining physicians'] findings regarding the claimant's ability to stand and walk throughout the workday, the claimant's ability to 'frequently' climb stairs, as well as [his] postural limitations," Tr. at 898. The court did not suggest in its earlier Ruling (including the adopted Recommended Ruling) that no aspects of the non-examining physicians' opinions were supported by substantial evidence. Rather, the court identified several, specific issues on which their reports appeared deficient. See Tr. at 1012–13.

In his Motion to Reverse, Johnston does not object to any specific aspects of the non-treating physicians' reports. And, indeed, many of the conclusions of the non-examining physicians might find adequate support in the record. See, e.g., Joint Stip. at 16 ("Mr. Johnston estimated that he can hold about 2 gallons of milk for approximately 15–20 minutes before his pain increases in his lower back and shoulders."); Tr. at 76 (Report of Dr. Khan) (suggesting Johnston can "[o]cccasionally" lift "20 pounds"). Nevertheless, because the ALJ improperly weighed the treating physicians' opinions and the case will be remanded, the court observes that it cannot conclude that the ALJ properly determined that the opinion of the "non-examining source is more consistent with the records as a whole" and so entitled to greater weight. See Wright, 2017 WL 202171, at *6. Moreover, the ALJ should have acknowledged the

effect of the treating physicians' longitudinal relationships with Johnston in determining how much weight to afford their opinions relative to those of the non-examining physicians.

In sum, the ALJ erred in weighing the medical opinion evidence. Specifically, he did not sufficiently manifest awareness of the information in the record that supports the treating physicians' opinions. This error infects his decision to give only "some weight" to the treating physicians' opinions, which in turn prevents the court from concluding that his assignment of "great weight" to the non-examining physicians was not error.

B.     <u>Credibility of Johnston's Testimony</u>

When the ALJ determines a claimant's RFC, he must "take the claimant's reports of pain and other limitations into account . . . ." <u>See</u> <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citing, <u>inter</u> <u>alia</u>, 20 C.F.R. § 416.929). Social Security Administration regulations "provide a two-step process for evaluating a claimant's assertions of pain and other limitations." <u>Id.</u> More specifically:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). That requirement stems from the fact that subjective assertions of pain <u>alone</u> cannot ground a finding of disability. 20 C.F.R. § 404.1529(a). If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. <u>Id.</u> The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings." 20 C.F.R. § 404.1512(b)(3); <u>see also</u> 20 C.F.R. § 404.1529(a); S.S.R. 96–7p.

<u>Genier</u>, 606 F.3d at 49. Crucially, the ALJ need not accept "claimant's subjective complaints without question," but instead "may exercise discretion in weighing the

credibility of the claimant's testimony in light of the other evidence in the record."
Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) (summary order) (quoting Genier,
606 F.3d at 49); see also Bain v. Colvin, No. 3:13–cv–1473 (AVC), 2015 WL 12681369,
at *5 (D. Conn. Oct. 1, 2015) (citing Genier, 606 F.3d at 49). The court should be
careful not to disturb the ALJ's evaluation of the claimant's claims of subjective pain:
"[a]fter all, the ALJ is in a better position to decide issues of credibility." See Snell v.
Apfel, 177 F.3d 128, 135 (2d Cir. 1999) (citing Kirkland v. R.R. Ret. Bd., 706 F.2d 99,
103–04 (2d Cir. 1983)).

Here, the ALJ determined at the first step of the requisite analysis that "the
claimant's medically determinable impairments could reasonably be expected to cause
the alleged symptoms . . . ." See Tr. at 894. However, at the second step, the ALJ
concluded that "the claimant's statements concerning the intensity, persistence and
limiting effects of these symptoms are not entirely credible . . . ." See id. Johnston
articulates three primary objections to the ALJ's credibility determination: (1) that
Johnston's "sporadic activities of daily living" are not inconsistent with disability; (2) that
the ALJ should not have found that Johnston abused narcotic medications; and (3) that
the ALJ's reference to Johnston's continued cigarette smoking does not support a
finding that he was not credible. See Mot. to Rev. at 10–11. The Commissioner
defends the ALJ on each ground. See Mot. to Affirm at 7–10.

First, the ALJ's reliance on Johnston's reported daily activities in evaluating his
credibility was proper. The ALJ carefully noted several daily activities Johnston
undertakes that appear inconsistent with the extreme pain he reported. See Tr. at 894–
95 (discussing, inter alia, claimant's admission that he "takes his dog for a walk,

sometimes performs welding which entails carrying small pieces of sheet metal, and [ ] works on restoring an old truck").  As Johnston points out, <u>see</u> Mot. to Rev. at 10, these inconsistencies may not by themselves constitute substantial evidence on which the ALJ could base his disability determination.  However, the ALJ was entitled to conclude that these inconsistencies indicate that other portions of Johnston's testimony—namely, his allegations of extreme pain and physical limitations—are "not entirely credible."  <u>See</u> Tr. at 894; <u>see also</u> <u>Calabrese v. Astrue</u>, 358 F. App'x 274, 277–78 (2d Cir. 2009) (summary order).

Second, the ALJ's references to Johnston's drug seeking behavior was not inappropriate.  To the extent Johnston claims that he was not, in fact, engaged in such behavior, Judge Fitzsimmons previously rejected that contention—in her Recommended Ruling that was adopted by this court—noting that "the record is rife with statements of concern about plaintiff's narcotic use."  <u>See</u> Tr. at 1016 n.52 (citing Tr. at 346, 827).  That same evidence is before the court in this appeal, and the court concurs with Judge Fitzsimmons's evaluation.  Whether "Mr. Johnston's need for chronic narcotic pain medication is [ ] unique," <u>see</u> Mot. to Rev. at 11, there was substantial evidence to support the ALJ's conclusion that he exhibited drug seeking behavior.[7]

---

[7] The court's discussion above addresses Johnston's claim that the ALJ erred in finding that he exhibited drug seeking behavior.  However, the ALJ may also have referenced Johnston's narcotic medication dependence in order to call attention to evidence in the record suggesting that Johnston was dishonest in the course of his efforts to obtain more prescription medication.  <u>See, e.g.</u>, Tr. at 578 ("Last week called in for oxycodone for back pain and script wasn't filled.  (Records show that it was)").  <u>See generally</u> Mot. to Affirm at 8–9.  To the extent the ALJ's reasoning rested on such duplicitousness—rather than on the fact of Johnston's drug dependence—the court suggests that the ALJ clarify that on remand, if appropriate.

Finally, Johnston takes issue with a sentence in the ALJ's discussion of his credibility that references his continued smoking. <u>See</u> Tr. at 895.[8] Despite Johnston's suggestion that "[t]he record is clear that Mr. Johnston's disability is primarily due to his musculoskeletal impairments rather than his COPD," Mot. to Rev. at 11, the ALJ certainly relied, at least in part, on the COPD in determining Johnston's RFC, <u>see, e.g.</u>, Tr. at 893 (noting Johnston is only "able to tolerate occasional exposure to concentrated levels of airway irritants such as fumes, gases, and excessive temperatures"), 898–99 ("Dr. Schwarz's finding that the claimant should avoid exposure to pulmonary irritants is also consistent with a diagnosis and treatment of COPD."). Nevertheless, the court agrees with Johnston that his continued smoking carries almost no probative value in assessing whether his reports of respiratory difficulties are credible. <u>See, e.g.</u>, <u>Hilsdorf v. Comm'r of Soc. Sec.</u>, 724 F. Supp. 2d 330, 352 n.12 (E.D.N.Y. 2010) (noting that people often continue to smoke, "not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the products impacts their ability to stop" (citation and quotation marks omitted)). To the extent the ALJ erroneously discredited Johnston's testimony on this ground, such error is harmless. In a similar case, the Second Circuit concluded that, because "substantial evidence supported the ALJ's overall credibility determination," the ALJ's improper evaluation of the claimant's failure to quit smoking was harmless. <u>See</u> <u>Suttles v. Colvin</u>, 654 F. App'x 44, 46–47 (2d Cir. 2016) (summary order). Because the ALJ's reference to Johnston's smoking was so brief—just one sentence—and because his overall credibility

---

[8] The relevant portion of the ALJ's Decision reads, in its entirety, as follows: "Furthermore, despite the alleged limitations caused by his chronic obstructive pulmonary disorder, the claimant testified that he continues to smoke every day." Tr. 895.

24

determination was supported by other substantial evidence, the court concurs with the Commissioner that any error on this point was harmless.

Though the court rejects Johnston's specific claims of error, it cannot conclude that the ALJ properly evaluated his credibility. As Judge Fitzsimmons noted in the first appeal, <u>see</u> Tr. at 1015–16, the ALJ's reliance on evidence on which he placed improper weight—here, the opinions of treating and non-examining physicians, <u>see</u> <u>supra</u> Part IV.A—calls into question his evaluation of Johnston's credibility. As such, "to the extent that the ALJ's credibility determination relied on the non-treating, non-examining sources," and did not rely on the treating physicians, "the ALJ should reconsider the weight placed on such evidence on remand." <u>See</u> Tr. at 1016.

## V. CONCLUSION

For the reasons set forth above, Johnston's Motion for Judgment on the Pleadings (Doc. No. 13) is **GRANTED IN PART AND DENIED IN PART**. The Commissioner's Motion to Affirm (Doc. No. 16) is **DENIED**. Notwithstanding the fact that this is the court's second reversal of the Commissioner in this case, remand to the Social Security Administration for further proceedings regarding Johnston's claim that he was disabled before April 2014 and consistent with this Ruling is appropriate.

**SO ORDERED.**

Dated at New Haven, Connecticut this 7th day of July, 2017.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge